## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Darnell Crawford, Maudine Crawford, and Tracy Crawford, Joint Trustees for the Heirs and Next of Kin of DelShawn Crawford, deceased, | Civil No. 13-2562 (DWF/JJK) |
| Plaintiffs, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| Laura Turner, individually and in her official capacity as a Minneapolis Police Officer; and Chad Meyer, individually and in his official capacity as a Minneapolis Police Officer, | |
| Defendants. | |

Joshua A. Newville, Esq., and J. Ashwin Madia, Esq., Madia Law LLC, counsel for Plaintiffs.

Tracey N. Fussy, Andrea Kloehn Naef, and Brian Scott Carter, Assistant Minneapolis City Attorneys, counsel for Defendants.

### INTRODUCTION

This matter is before the Court on a Motion for Summary Judgment brought by Defendants Laura Turner ("Officer Turner") and Chad Meyer ("Officer Meyer") (together, the "Officers" or "Defendants") (Doc. No. 58); a Motion to Exclude Expert Testimony brought by Defendants (Doc. No. 57); and a Motion for Order to Show Cause Regarding Jurisdiction brought by Defendants (Doc. No. 64). For the reasons set forth

below, the Court denies the motion for summary judgment; denies the motion to exclude expert report without prejudice to Defendants to bring it again as a *motion in limine*; and denies the motion for order to show cause.

## BACKGROUND

On May 11, 2012, DelShawn Crawford ("Crawford") was at a family gathering at the apartment of his girlfriend, Brandy Lewis ("B. Lewis"). (Doc. No. 71 ("Fussy Aff.") ¶ 11, Ex. 10 ("B. Lewis Dep.") at 14, 18-21; *id*. ¶ 4, Ex. 3 ("Davis Dep.") at 37-40.) Most people at the gathering left at "about 1:30 [a.m.]" on May 12, 2012, while Crawford, B. Lewis, B. Lewis's two sons (Alf Davis, Jr. and Robert Cotton), Lewis's cousins (Ty'rell Jones and Brieanna Lawson), and B. Lewis's son's friend (Prince Early), remained. (Fussy Aff. ¶ 10, Ex. 9 ("Lewis Video").)[1]

Both Crawford and B. Lewis had been drinking. (B. Lewis Dep. at 14, 18-21.) Crawford was intoxicated. (B. Lewis Video.) Crawford and B. Lewis argued and Crawford became verbally and physically abusive. (*Id*.; Davis Dep. at 39-40.) Despite attempts to intervene, Crawford and B. Lewis continued to argue. (B. Lewis Video.) At some point, Crawford picked up a knife from the kitchen drawer. (*Id*.) B. Lewis testified that she told Crawford "about fifteen to twenty times" to put the knife down and to leave.

---

[1]   In their moving papers, Defendants recount incidents of domestic violence and evidence of Crawford's criminal history. That information is not relevant to the present motion because there is no evidence that Crawford's history impacted what the Officers knew at the time of the incident and, therefore, it is not related to the reasonableness of their actions.

(*Id.*)  Eventually, Crawford placed the knife on the dining table and started to move towards the door.  (*Id.*; B. Lewis Dep. at 21-23.)  Crawford stood in front of the knife, such that B. Lewis believed he would have reached it first if she tried to grab it.  (B. Lewis Video.)

At 2:14 a.m., a neighbor called 911.  (Fussy Aff. ¶ 15, Ex. 14 ("911 Audio").)  At 2:15 a.m., the responding Officers were told that the calling party could hear a female yelling for someone "to put the knife down."  (*Id.*)  At 2:16 a.m., dispatch informed the Officers that the suspect had a knife, that the suspect was known to run from the police, and that Crawford had been abusive in the past.  (Fussy Aff. ¶ 7, Ex. 6 ("Turner Dep.") at 26-27; *id*. ¶ 8, Ex. 7 ("Meyer Dep.") at 16-17; 911 Audio.)

The Officers arrived at the apartment complex, gained entry, and moved up the staircase towards Lewis's apartment.  The Officers had their guns drawn.  (Turner Dep. at 17; Meyer Dep. at 19.)  Officer Turner testified that she heard a male from inside the apartment state: "I'm going to kill you."  (Turner Dep. at 28.)  What happened next is disputed.

According to the Officers, when they arrived on the landing of the stairs (roughly 4 feet by 5 feet), Crawford opened the door of the apartment and was holding a knife.  (Turner Dep. at 35, 38; Meyer Dep. at 35-37.)  The Officers testified that Crawford appeared shocked to see them.  (Turner Dep. at 39; Meyer Dep. at 37.)  Officer Turner testified that she stepped off the landing and crouched on the stairs to create space.  (Turner Dep. at 43-44.)  Officer Meyer was still standing and had his gun pointed at Crawford.  (Meyer Dep. at 20-21.)  Officer Meyer also testified that he "immediately

3

identified [the Officers] as police, and yelled at [Crawford] to drop the knife." (*Id.* at 36-38.) The Officers also claim that Crawford responded by pointing the knife at them and lunging forward. (Turner Dep. at 40-41; Meyer Dep. at 37-38.) The Officers maintain that in response to this threat, they fired their weapons. (Turner Dep. at 47, 50, 59; Meyer Dep. at 39.) At this point, the Officers contend that Crawford was within three feet of them. (Turner Dep. at 47.) Officer Turner shot immediately, while moving down the stairs. (*Id*. at 48.) Officer Meyer fired between three and seven shots. (Meyer Dep. at 39.) Crawford died as a result of being shot.

Lewis testified that Crawford put the knife down on the kitchen table and was not holding the knife at the time the police arrived. (B. Lewis Dep. at 27-28, 32, 44-45.) Lewis's son also testified that the argument had died down and Crawford was not holding the knife when the police arrived. (Cotton Dep. at 68-71.) In addition, witnesses testified that the Officers did not announce themselves or issue any orders prior to firing their weapons. (B. Lewis Dep. at 32-33; Cotton Dep. at 44-45; Davis Dep. at 46-48; Fussy Aff. ¶ 25, Ex. 24 ("Jones Dep.") at 36-38, 68.) B. Lewis stated that she did not hear a knock. (B. Lewis Video.) B. Lewis denied hearing Officer Meyer yell "Drop the knife," and instead claimed that she heard "get on the ground" after the gunshots. (B. Lewis Dep. at 84.)[2] Further, Lewis testified that in the moments before the gunfire, she was

---

[2] Defendants point out that there have been inconsistencies in B. Lewis's account of the events at issue in this action. Defendants contend that there are several such material inconsistencies between the account she gave to the police during her interview immediately after the incident and at an early deposition and the account given in a later

(Footnote Continued on Next Page)

4

looking at and talking to Crawford, that he was pacing in the area three to four feet away from her at the time, that he did not have a knife, and that he did not move towards the door. (*Id.* at 33, 71-83.) Witnesses testified that they heard a loud sound of the apartment door being kicked or forced open. (*See, e.g.*, Cotton Dep. at 43-45, 66-67, 69; Davis Dep. at 46-48; Jones Dep. at 38-40.) Finally, B. Lewis testified that Crawford was about four or five feet away from the front door when she heard the gunshots. (B. Lewis Dep. at 77.) Moreover, Plaintiffs have submitted other evidence that they contend suggests Crawford was farther away and perhaps inside the apartment when he was shot.[3]

---

(Footnote Continued From Previous Page)

deposition. For example, during the police interview, B. Lewis stated that she heard "get on the ground" and then the gunshots. (B. Lewis Video.) Defendants maintain that B. Lewis is attempting to create a sham issue of fact. The Court acknowledges that there are certain inconsistencies. However, those inconsistencies, alone, do not warrant the grant of summary judgment. Instead, B. Lewis's testimony, and that of other witnesses, will be tested before the jury on cross-examination. It is entirely possible that inconsistencies will weigh heavily against the reliability of the testimony, but that will be for a jury to decide.

[3]     Plaintiffs point to the Expert Report of Forensic Consultant Richard N. Ernest. Defendants have moved to exclude the opinions of Ernest. (Doc. No. 57.) Because consideration of Ernest's opinions are not necessary to issue a ruling on the motion for summary judgment, the Court declines to rule on the motion to exclude at this time. Instead, the Court denies the motion to exclude as moot and will consider renewed motions, if necessary, at the pretrial stage as a motion *in limine*. The Court notes, however, that based on the arguments before the Court, it appears that at least some of Ernest's testimony will be excluded. Even so, the Court's decision with respect to the present motion would be the same with or without consideration of Ernest's testimony.

## DISCUSSION

**I.     Motion to Show Cause**

As an initial matter, the Court considers Defendant's motion to show cause regarding jurisdiction. (Doc. No. 64.)

On February 6, 2013, a Hennepin County District Judge appointed Plaintiffs as Joint Trustees to maintain the action described in the Petition, namely: "That the death of the Decedent was caused by the wrongful acts or omissions of the Minneapolis Police Department and possible others, and that a cause of action exists under Federal law." (Doc. No. 78 ("Madia Decl.") ¶ 2, Ex. 2 at ¶ 6.)

Defendants argue that the trustees may recover for certain injuries to the next of kin caused by the decedent's death and that these damages are not recoverable under Section 1983. Given that limitation, Defendants seek an order to show cause why Plaintiffs have standing under Section 1983. Plaintiffs maintain that they followed Minnesota statutory procedures to obtain trustee status and brought this action in compliance with Minnesota and federal law. In addition, Plaintiffs argue that Defendants conflate the issue of damages and standing and suggest that the parties brief the issue of the proper measure of damages at a later stage.

As indicated at the hearing on this matter, the Court denies Defendants' motion to show cause. Instead, the Court will allow the parties to brief the issue of the proper measure of damages in this action at the pre-trial hearing.

## II. Motion for Summary Judgment

### A. Legal Standard

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Courts must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party.  *Weitz Co. v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009).  However, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly supported motion for summary judgment "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

The doctrine of qualified immunity protects state actors from civil liability when their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The defense provides "ample room for mistaken judgments" as it protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 343 (1986). To overcome the defense of qualified immunity, a plaintiff must show that: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation. *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) (citation omitted). The Court has discretion to decide which qualified immunity prong to consider first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Denial of qualified immunity is appropriate where "a genuine issue of material fact exists as to whether a reasonable officer could have believed his actions to be lawful." *Craighead v. Lee*, 399 F.3d 954, 960-61 (8th Cir. 2005).

### B.   Excessive Force Under 42 U.S.C. § 1983

Plaintiffs assert a claim of excessive force and unreasonable seizure against Officers Turner and Meyer. Defendants move for summary judgment on this claim, arguing that their actions were objectively reasonable and that they are entitled to qualified immunity.

The Fourth Amendment prohibits unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394-95 (1989). The Court evaluates excessive force claims under an objective-reasonableness test. *Id*. at 397. In determining whether the use of force is

"reasonable" under the Fourth Amendment, a court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against the government's interests at stake. *Id.* at 396 (citation omitted). The reasonableness of the use of force must be judged from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* The proper application of the Fourth Amendment "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The key question is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Craighead*, 399 F.3d at 961. The Court's decision here turns on the question of whether, taking the facts in the light most favorable to Plaintiffs, Crawford was subjected to excessive force so as to violate a constitutional right and, if so, whether that right was clearly established at the time.

"Apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Hassan v. City of Minneapolis*, 489 F.3d 914, 919 (8th Cir. 2007) (citation omitted). The use of deadly force is not constitutionally unreasonable if an officer has "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others." *Id.* However, where the suspect "poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Id.*

9

Defendants assert that the use of force was objectively reasonable because they believed Crawford had committed a serious offense, he had a knife, and because Crawford was in close proximity to the Officers such that the Officers reasonably believed he was going to attack them. Plaintiffs, on the other hand, contend that issues of disputed fact exist and that a reasonable fact finder could conclude that Crawford did not have a knife at the time the Officers arrived, Defendants did not issue any commands to Crawford prior to opening fire, Crawford did not lunge at the Officers, the Officers forced entry, and the Officers shot at a distance from greater than four feet. Plaintiffs further contend that the above factual issues are material to the resolution of this case and, therefore, summary judgment is inappropriate.

The parties agree that Officers Turner and Meyer responded to a reported incident of domestic violence involving a suspect (Crawford) with a knife who was also known for past domestic abuse and as one who would run from the police. Defendants contend that deadly force was reasonable here because a reasonable officer could have perceived a threat of serious bodily harm to the officers or others. In support, Defendants point to the additional facts that Crawford was intoxicated, dispatch had alerted them that Crawford had a knife and was threatening Lewis, and that when they arrived at the top of the stairs, they were confronted by Crawford who had, what they believed to be, a knife in his right hand. Defendants further assert that upon seeing the Officers, Crawford became angry, raised his elbow, and lunged towards them. The Officers claim that they believed that Crawford had a knife and that he was going to attack them when they fired their weapons. If the trier of fact believes the Officers' version of the facts, they could

conclude that the Officers had probable cause to believe that Crawford posed "a threat of serious physical harm" so as to justify the use of deadly force.

Plaintiffs, however, have recited a different set of facts and point to conflicting evidence that they contend, if believed, could lead a reasonable officer to conclude that Crawford did not pose such a threat so as to justify the use of deadly force. For example, Plaintiffs have cited to witness testimony disputing that Crawford had a knife at the time that the Officers confronted him, that the Officers did not identify themselves or order Crawford to drop the knife, that the Officers forced entry into the apartment, that Crawford did not lunge at the Officers, and that Crawford was not in the location that the Officers claim he was, when he was shot.

Viewing the disputed record in the light most favorable to Plaintiffs, the Court concludes that fact issues remain as to whether the Officers' use of deadly force was objectively reasonable. The undisputed facts that the Officers were responding to a domestic violence call, along with the fact that they had been informed that the incident involved a knife and that Crawford had a history of such incidents and might flee, alone, would not be enough to justify the use of deadly force. If the factfinder were to determine that the Officers believed that Crawford was holding a knife and that Crawford lunged at the Officers in the confined landing of the apartment stairs, the use of deadly force might be determined to be objectively reasonable. However, the surrounding circumstances and facts are disputed. The issues of material fact prevent the grant of summary judgment on Plaintiffs' excessive force and unreasonable seizure claim on the basis of qualified immunity.

**III.    Wrongful Death**

Plaintiffs also assert a claim of wrongful death against the Officers. The elements of a wrongful death claim are the appointment of a trustee and death caused by a wrongful act or omission of the defendant, which causes pecuniary loss to the next of kin. Minn. Stat. § 573.02. Defendants argue that Plaintiffs' wrongful death claim is barred by the doctrine of official immunity for the same reasons that they are entitled to qualified immunity.

Under Minnesota law, public officials are automatically entitled to official immunity from state law claims when their duties require the exercise of discretion, so long as the officer is not guilty of a willful or malicious wrong. *See Pletan v. Gaines*, 494 N.W.2d 38, 40-41 (Minn. 1992). Police officers are generally classified as discretionary officers. *Johnson v. Morris*, 453 N.W.2d 31, 42 (Minn. 1990). Here, there is no question that the Officers' actions required the exercise of discretion. Accordingly, to defeat official immunity, Plaintiffs must establish malice or willfulness. Malice in the context of official immunity requires proof that an officer intentionally committed a wrongful act without legal justification or excuse or, stated another way, willfully violated a known right. *Rico v. State*, 472 N.W.2d 100, 107 (Minn. 1991). The question of malice is an objective inquiry into the legal reasonableness of an official's actions. *Miskovich v. Indep. Sch. Dist.*, 226 F. Supp. 2d 990, 1021 (D. Minn. 2001). Usually, the question of willfulness is a question of fact to be resolved by the jury. *Craighead*, 399 F.3d at 963.

For the reasons discussed above with respect to qualified immunity, the Court concludes that issues of fact remain as to the reasonableness of the Officers' actions. Viewing the facts in the light most favorable to Plaintiffs, a reasonable juror could conclude that the officers acted intentionally without legal justification. Thus, official immunity is inapplicable here and the Court declines to grant summary judgment on Plaintiffs' wrongful death claim.

## CONCLUSION

The Court concludes that Defendants' Motion for Summary Judgment is properly denied. However, the Court notes that this was a very close case and cautions Plaintiffs not to equate victory at this stage with victory at trial. While fact issues exist, there appear to be considerable discrepancies in B. Lewis's testimony and that of other witnesses. These discrepancies will likely make it very difficult for Plaintiffs to prevail at trial. If the Officers' version of the facts is believed, Plaintiffs' claims will fail.

Based on the files, record, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion for Summary Judgment (Doc. No. [58]) is **DENIED**.

2. Defendants' Motion to Exclude Expert Testimony (Doc. No. [57]) is **DENIED** without prejudice to Defendants to bring the motion again at the pre-trial hearing as a motion *in limine*.

      3.      Defendants' Motion to Show Cause (Doc. No. [64]) is **DENIED**. The Court will allow the parties to brief the issue of the proper measure of damages in this action at the pre-trial hearing.

Dated: November 16, 2015          s/Donovan W. Frank
                                              DONOVAN W. FRANK
                                              United States District Judge